IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD MILES,

    Plaintiff,

v.

HARRISON STREET REAL
ESTATE CAPITAL,

    Defendant.

Case No. 1:24-cv-02282

## COMPLAINT

Plaintiff Ronald Miles ("Plaintiff"), by and through his attorneys, alleges the following against Defendant Harison Street Real Estate Capital ("Defendant"):

## INTRODUCTION

1.    This is an action for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §623 (Count I), and disability discrimination in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §12112(a) (Count II).

## JURISDICTION AND VENUE

2.    Jurisdiction is based on 28 U.S.C. §1331 and 1343.

3.    Venue is proper in the Court pursuant to 28 U.S.C. §1391(b)(2) because the unlawful employment practices alleged in this Complaint occurred in the Northern District of Illinois.

## THE PARTIES

4. Plaintiff, a resident of Will County, Illinois, is a 58-year-old man with Parkinson's Disease who was employed by Defendant as Senior Vice President/Director Asset Management from April 2017 until he was terminated on January 11, 2024.

5. Defendant is an investment management firm focused on alternative real assets with headquarters in Chicago and London and offices throughout North America, Europe and Asia and nearly $56 billion in assets under management.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment History With Defendant

6. Plaintiff was employed by Defendant as Senior Vice President/Director Asset Management, focused on Core Fund Investments, since April 2017.

7. His performance in that role, especially in the two years preceding his termination, was exemplary, as reflected in his bonuses for those performance periods, his performance evaluations, and overall feedback from the management team, as well as his peers and subordinates. In the most recent performance evaluation discussed with him, Ben Mohns, Senior Managing Director & Head of Asset Management/North America, praised him repeatedly:

- "Great job leading [the EV Charging] effort and working with the various stakeholders to accelerate installation across our portfolio."

- "Great job on managing the leasing activity (both renewals and new leases) along with the potential sale analysis and additional communication to PM/myself for CapMed."

2

- "[T]here's been really good feedback from your colleagues as to how you handle property tours with investors and your knowledge of the asset and market."

- "[G]reat job mentoring the analysts that work directly for you and overseeing the higher profile property tours. Feedback from all participants, investors, and colleagues have been very positive. Thank you for going the extra mile to teach the analysts."

8. Mr. Mohn's overall assessment of Plaintiff's annual performance in that review was that Plaintiff had had a "[g]ood year" that included not just "taking on some additional tasks but continu[ing] to find opportunities to set [him]self apart that drive meaningful impact throughout Defendant." A particular milestone acknowledged by Mr. Mohns was that Plaintiff had done a "great job on the EV chargers."

9. In addition to being recognized for being "very knowledgeable about [his] portfolio and asset," Plaintiff received consistent praise for living Defendant's core values and being a strong team player. As Mr. Mohns wrote in that last review, "You treat people with respect and display a high level of integrity," a sentiment that was echoed repeatedly in Plaintiff's mid-year review in June 2023. Indeed, Plaintiff received a higher overall rating in that 360º review (3.8) than the average manager rating (3.5) and Defendant's overall overage (3.7), with top scores (4.0) in the following areas that are essential to a positive Company culture:

- "Is a consistently trustworthy, respectful and supportive team member"

- "Treats all team members fairly and equally"

- "Ensures a workplace culture that promotes equity, diversity and inclusion"

- "Shows resilience in the face of constraints and frustrations"

- "Follows through on commitments to others"

10. Among the many positive comments shared by team members in the 360º review, the following are illustrative of his contributions:

- "It's been a pleasure working with Ron over the last 12 months We've been in near-constant contact regarding deliverables and deadlines. This has led to excellent teamwork and exceptional work product."

- "Much appreciate Ron's unique knowledge of the industry, willingness to try new initiatives, step up and take charge where needed and to work to hold people accountable. Been a pleasure working alongside him."

- "Very ethical in his approach to business relationships and how he conducts himself. Always on the up and up. Willing to call out where things are working and where [sic] might be falling short."

- "He is very intelligent and well versed in the commercial real estate industry. He is helpful and patient when I have questions. He is also respectful and seems to highly value both his work and family which are honorable characteristics and sometimes seem rare in this field."

- "Ron's trust in his supports and encouragement for them to take leadership with their work is extremely beneficial to his team's success and development. He does a phenomenal job holding his team accountable and being on top of all necessary processes, while also providing ample opportunities and encouragement for his support's career development."

11. Plaintiff's contributions for his 2022 bonus year paid March 2023 were considered so exceptional that he was rewarded with a 105.6% bonus that exceeded his target.

**Defendant's Perception of and Reaction to the Progression of Plaintiff's Disability**

12. Plaintiff was diagnosed with Parkinson's Disease in December 2019. Defendant was unaware of his condition, however, until he disclosed it to his manager in the summer of 2021 when he still had no obvious symptoms.

13. In the past two years, however, Plaintiff's disease progressed significantly, making it more difficult for him to commute to work.

14. On February 8, 2023, shortly after the completion of a favorable performance review, he asked David Liu, his immediate supervisor, and Mr. Mohns for his first accommodation: to work remotely one day per week in addition to Fridays which were remote for all employees.

15. Mr. Mohns deferred to Mr. Liu who, after failing to respond for two weeks, told Plaintiff that he did not want to document any arrangement formally. Instead, Mr. Liu insisted that Plaintiff notify management each time his Parkinson's symptoms necessitated a work-from-home ("WFH") day.

16. There was no business justification for not allowing Plaintiff to take an extra WFH day on a regular basis given that remote work was already the norm for all of Defendant's employees on Fridays, some of Plaintiff's peers worked remotely 100% of the time, and Plaintiff was fully able to perform his job from home.

17. Plaintiff's work was not compromised in any way by his remote schedule or his disability, nor was he given any feedback in any of his monthly "catch-up" meetings with his manager of any material deficits in his progress toward his annual goals. To the contrary, Plaintiff's outstanding job performance was reflected not only in his performance reviews from

5

his manager throughout 2023, but also in a 360º review from his peers and subordinates in June 2023, as well as correspondence from senior management up to the day of his termination.

18. Although Plaintiff's WFH requests were typically approved, the requirement that he provide constant notice to his supervisor had the effect of highlighting his disability to management every week. This would not have been the case if a blanket accommodation had been granted. Having been reminded every week of Plaintiff's need to work remotely an extra day due to his disability, Defendant began to perceive his condition more negatively over time.

19. In addition to the physical challenges Plaintiff experiences as a result of his Parkinson's Disease, he suffered another medical setback in August 2023 due to complications from surgery which left him hospitalized for 6 days and on a medical leave for several weeks. Mr. Liu was clearly displeased by this turn of events as evidenced by his insistence that Plaintiff return to work full-time before he was medically released to do so and his threat to place him on disability leave if he refused.

20. When Plaintiff proposed a one-week transition for his return so that no details would fall through the cracks, Mr. Liu yelled at him and told him on a Friday that he had the weekend to read the hundreds of emails that had come in during his medical leave and to be prepared to lead on Monday. Despite that also being the weekend of Plaintiff's son's wedding, he did everything Mr. Liu asked of him and, not wanting to disappoint Mr. Liu, returned to work full-time that Monday, September 11, 2023, against medical advice.

**Plaintiff's Termination**

    **The December 20, 2023 Meeting**

21. On December 20, 2023, during their regular monthly catch-up meeting, Mr. Liu told Plaintiff for the first time that he was "disappointed" with his performance for the year.

Plaintiff was completely shocked by this criticism given his extraordinary accomplishments during the year that had created enormous value for Defendant and its investors and all of the positive feedback he had received throughout the year.

22. At first, Mr. Liu offered vague accusations about Plaintiff's alleged lack of "leadership." But when Plaintiff gave examples refuting this criticism and noted that it was completely inconsistent with the near-uniformly positive feedback he had received just 6 months earlier in his 360º review, Mr. Liu then pivoted to a different reason, blaming Plaintiff for failing to kill the project with Xeal EV chargers. Again, this was an unreasonable and unfair criticism given the CEO's ownership interest in and pressure to pursue the deal with Xeal, and the fact that Plaintiff ultimately followed directives from more senior leaders.

23. The timing of Mr. Liu's comments was especially incongruous considering that Plaintiff had recently closed one of Defendant's most strategically critical deals of the year -- the CapMed refinancing and disposition of two assets – for which he had recently received exuberant praise from all corners of management:

- "Congratulations, Drew and Ron! Appreciate all of your efforts identifying the optimal strategy for this portfolio over the past year to generate the required liquidity to support continued leasing efforts and our ongoing refinancing effort to maximize value across the remainder of the portfolio." (10/12/23 email from Ben Mohns)
- "Yes! Thank you…" (10/12/23 email from Joey Lansing, Global Head of Portfolio Management and Strategy)
- "YESSSSSS- Big win to steer through some choppy waters and address a complicated portfolio." (11/3/23 email from Dave Liu)

- "Congrats, Drew and Ron. Good outcome in a very challenging environment." (11/6/23 email from Ben Mohns)

23. At no point in the December 20 meeting was Plaintiff given any indication that his job was in jeopardy. When he asked Mr. Liu point blank if his job was on the line, Mr. Liu's glib response was that "all of our jobs are always on the line," without signaling any unique threat to Plaintiff. Although Plaintiff felt it was unfair for these issues to be raised for the first time with only 10 days left in the year, he nevertheless committed to adjusting his goals for the following year in whatever way Mr. Liu directed, and they scheduled a follow-up meeting for January 4, 2024 to discuss how to move forward.

**The January 4, 2024 Meeting**

24. Plaintiff came to the January 4 meeting full of ideas for how he could continue to contribute to Defendant's business, including taking a larger role in due diligence on new acquisitions. However, although Mr. Liu had claimed in their December 20 meeting that he wanted to hear Plaintiff's plans for the future, he did not seem at all interested in this topic.

25. Instead, Mr. Liu shifted the conversation to accuse Plaintiff of not participating enough in department and Firm-wide social events, claiming that this was an important part of Defendant's "culture." Plaintiff pointed out that he did attend Firm events generally, including Impact and Portfolio Management team events and Firm-wide events, as well as external events attended by Firm partners, with the exception of a single dinner that turned into a trip to a strip club.

26. Plaintiff explained that he was less comfortable with his team's preferred events which were dominated by late-night raucous alcohol-drinking activities, including pressure to do shots and get drunk – typically with team members who were largely in their 20s and 30s. He

8

noted, too, that, just because he, as the oldest member of the team by more than a decade, preferred not to party until 2am, he was still a valuable contributor to Defendant's culture.

27. Plaintiff further stated in this conversation that he believed that he had been denied career opportunities due to Defendant's negative perception of his age and his Parkinson's Disease. Younger employees were routinely favored for such opportunities to help grow their careers rather than older employees like him who did not have 20 years left in his working career. Mr. Liu himself had asked Plaintiff not to attend an important industry event in 2022 to allow "younger" employees to attend instead to expand their careers and networks.

28. Mr. Liu bristled at this accusation of age and disability discrimination and quickly changed the subject to criticize Plaintiff for never having spoken on an industry panel during his tenure with Defendant. When Plaintiff noted that his Parkinson's symptoms were exacerbated by public speaking, Mr. Liu became visibly irritated and admonished him for "bring[ing] up Parkinsons." Plaintiff explained that he simply wanted Defendant to be aware of how his symptoms might be perceived in a public setting, but he reiterated that he remained willing and able to participate on these panels if asked to do so.

29. In this same meeting, Plaintiff also reaffirmed his commitment to adapt to new goals for the coming year to match Mr. Liu's expectations. Mr. Liu agreed that they would discuss next steps at a meeting to be scheduled toward the end of the month.

**The January 11, 2024 Termination Meeting**

30. The expected month-end meeting to discuss new goals never happened. Instead, Plaintiff was shocked to find himself called into a meeting a week later with Mr. Liu, Mr. Mohns and a Human Resources representative, where he was told that he was being let go because Defendant had been unable to find a way to "use his talents." As if the shock of this news was not

9

enough, Mr. Mohns then offered a revolving door of alleged reasons for the termination that are demonstrably untrue.

31. Defendant immediately announced that Plaintiff's position would be filled by an Assistant Vice President, a position requiring only "10 years of relevant experience working in Commercial Real Estate investment roles within Medical Office or Healthcare sectors," according to the job posting. Compared to Plaintiff's 35 years of relevant experience, this is a more junior role that presumably will be filled by a younger candidate without a disability.

**Defendant's Termination Reasons Are a Pretext for Disability and Age Discrimination**

32. Defendant cited several reasons for terminating Plaintiff in the January 11, 2024 termination meeting, that he: (1) "did not fit" with its "culture," (2) did not speak on industry panels, and (3) had failed to build consensus to kill a project regarding EV chargers. Defendant will also likely rely on a December 2023 performance evaluation that was never given to Plaintiff and never even seen by him until after his termination when his personnel file was produced. All of these reasons are pretextual.

33. That Defendant decided to get rid of Plaintiff despite indicators of strong performance from all corners up until the day of his termination, after he confided to his managers that his Parkinson's Disease was worsening and was criticized for not being a good "fit with the culture" because he demurred from youth-oriented drinking activities, strongly suggests that he was terminated on the basis of his disability and his age.

34. Defendant's unease with disabled employees is consistent with its hard-partying youth culture that favors young, vibrant, healthy employees. Defendant's workforce is overwhelmingly young – approximately 80% of Defendant is under 35 and most members of upper management, including Plaintiff's manager, are in their early to mid-40s. Younger employees are

favored for career development opportunities and social events revolve around fraternity-type drinking activities targeted to appeal to younger employees.

35. Plaintiff, 58 years old, was one of only three employees over 50. The only other employee in his age group was also terminated in 2021 at the age of 58 and replaced by a younger employee with less experience.

36. Defendant's accusation that Plaintiff "did not fit" with its culture is not only untrue but reveals Defendant's bias against him as an older employee with a disability.

37. The second reason regarding industry panels is equally baseless considering that Plaintiff had never been told this was an important, much less required part of his job; none of his performance reviews had ever mentioned his participation on such panels; and none of his peers regularly participated on such panels. Besides, even when Plaintiff explained that his Parkinson's symptoms would make him a less polished speaker than Defendant might prefer for its image, he remained willing and able to participate on these panels if asked to do so.

38. Similarly, the criticism about the EV charge project was unreasonable given Defendant's CEO's ownership interest in and pressure to pursue the project, and the fact that Plaintiff ultimately followed directives from more senior leaders.

39. Equally suspect is the fact that Defendant began to secretly paper Plaintiff's personnel file with self-serving documents just weeks before terminating Plaintiff, including a critical performance review that was never shared with him and that solicited negative feedback from managers who, by their own admission, had no knowledge of his work.

**PROCEDURAL REQUIREMENTS**

40. Plaintiff filed a timely discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), attached hereto as Exhibit A ("Charge"), which encompasses the allegations contained in this Complaint.

41. More than 60 days have elapsed since the filing of Plaintiff's Charge, as required for the filing of a claim under the ADEA. 29 C.F.R. § 1626.7 (a).

42. The EEOC issued a Notice of Right to Sue, attached hereto as Exhibit B, which was received on March 1, 2024. This Complaint is being filed within 90-days of Plaintiff's receipt of the EEOC's Notice of Right to Sue, as required for the filing of a claim under the ADA. Accordingly, Plaintiff has met all procedural prerequisites to bringing the present action.

**COUNT I
AGE DISCRIMINATION
IN VIOLATION OF THE ADEA
29 U.S.C. §623**

43. Plaintiff realleges and incorporates by reference the allegations set forth above as though fully stated herein.

44. The Age Discrimination in Employment Act prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1).

45. Defendant terminated Plaintiff on January 11, 2024 on the basis of his age, in violation of the ADEA.

46. Defendant willfully engaged in the discriminatory conduct described herein.

47. As a result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered damages.

## COUNT II
## DISABILITY DISCRIMINATION
## IN VIOLATION OF THE ADA
## 42 U.S.C. §12112(a)

48. Plaintiff realleges and incorporates by reference the allegations set forth above as though fully stated herein.

49. It is unlawful under the ADA to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. §§12112(a).

50. Plaintiff was a "qualified individual" entitled to the protection of the ADA because he was capable of performing the essential functions of his position with or without reasonable accommodations. 42 U.S.C. § 12111(8).

51. Defendant terminated Plaintiff on the basis of his Parkinson's Disease, in violation of the ADA. 42 U.S.C. §12112(a).

52. Defendant engaged in the discriminatory conduct described herein with malice or reckless indifference to Plaintiff's federally protected rights.

53. As a result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered pecuniary and emotional damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A. Enter a judgment that the conduct of the Defendant alleged herein violates the laws of the United States;

B. Award Plaintiff all back pay, front pay, commissions, bonuses, pre-judgment interest, liquidated damages, penalties, and any other remuneration to which he would have been entitled but for Defendant's unlawful conduct;

  C. Award Plaintiff compensatory and punitive damages for violations of the ADA;

  D. Award Plaintiff the costs of this action, including reasonable attorneys' fees, expert fees, and any other costs reasonably incurred in the litigation of this matter;

  E. Award Plaintiff such other and further equitable, injunctive and legal relief as this Court finds necessary and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,

RONALD MILES


By */s/Brenda H. Feis*
   One of His Attorneys

Brenda H. Feis
FEIS GOLDY LLC
800 N. Michigan Ave.
Suite 3602
Chicago, IL 60611
(312) 523-2200
bfeis@feisgoldy.com

March 20, 2024